## STRAUS v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, Second Department.   May 5, 1916.)

DAMAGES ⬤⟳189—BREACH OF CONTRACT—SUFFICIENCY OF EVIDENCE.
     Evidence in an action against a city for breach of contract to build by
     a certain day, an entrance, on or adjacent to plaintiff's premises, to a sub-
     way station, *held* insufficient to show what injury to plaintiff's property
     was caused thereby.
     [Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 288, 512; Dec.
     Dig. ⬤⟳189.]

Appeal from Trial Term, Kings County.

Action by Julius Straus against the City of New York. From a
judgment for plaintiff, defendant appeals.  Reversed, and new trial
granted.

See, also, 166 App. Div. 199, 151 N. Y. Supp. 1019.

Argued before JENKS, P. J., and THOMAS, CARR, RICH, and
PUTNAM, JJ.

Edward A. Freshman, of Brooklyn (Thomas F. Magner, of Brook-
lyn, on the brief), for appellant.

Benjamin Reass, of Brooklyn (Hugo Hirsh and Emanuel Newman,
both of Brooklyn, on the brief), for respondent.

THOMAS, J.   The plaintiff owns the northwest corner of Fulton
and Bridge street in the borough of Brooklyn, and has recovered judg-
ment for $7,866.67 damages to the rental value thereof by reason of
the failure of the defendant to comply with a contract dated June 15,
1905, whereby the city agreed, in connection with the building of a
subway under Fulton street, to the following:

"Third—The work of constructing the said station and stairway, in so far
as the same involves the work of building an entrance thereto upon or adja-
cent to the said premises of the parties of the first part, shall be done between
the 1st day of May and the 1st day of October in the year" 1906.

The entrance on Bridge street, shown on the diagram attached to the
contract, was so incomplete, the court found, as to prevent the plaintiff
using the front 40 feet of the basement for one year and four months
after October 1, 1906.   That such entrance was not made in time is
undeniable, but the question is:  What injury to plaintiff's property
was caused thereby?   The plaintiff had made a lease that required it
to tear down two buildings fronting on Fulton street, and to build on
the site a new store, and to conform to it a third building in the rear,
facing on Bridge street, and undertook to do such work between May
1 and October 1, 1906, and the parties hereto had such undertaking in
contemplation.   But why did not plaintiff use the front part of the
basement?   He testified that his building was complete by October 1st,
except show windows that were to be placed in the front of the base-
ment on Fulton street, and the side of the basement looking upon the
proposed stairway on Bridge street.   He states that he could not set
the show windows, because the city had not tiled the brick walls, and

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

that, in addition, he had on October 1, 1906, but a "day or two of work in order to complete" the basement.

But the tiling of the rough brick wall that faced the entrance and the station was outside work. How could that interfere with the placing of the show windows? The plaintiff answers that the subway builders had to "finish their tiling on the returns before we could put any plate glass in." What is meant by tiling the returns? That must be known, to determine whether it was the duty of the city to do it. Reference must be made to the evidence to determine the nature of such tiling, and at the same time it is convenient to learn whether such tiling was the only impediment to the completion of the basement. I hazard the statement that the returns are the walls on their exposed width. It was the duty of the city to tile the outside of the brick walls, but where there was an opening for a window or door the wall for its width would show. But that would all be inside the wall line, and part of it, maybe, within the show windows when set. So it becomes very important to know whether the city should pay the large sum adjudged against it because this work within the line, and possibly interior, of the building was not done.

Frost, the assistant engineer of the Rapid Transit Company, testified:

"Weren't you required to tile that pier all around? A. Not on the inside; no, sir. * * * Q. Didn't you, as matter of fact, tile the pier all around? A. On the subway side only. Q. No; I am asking you whether, as matter of fact, that pier was not tiled by you all around? A. I think not. * * * I have no recollection of seeing the tile on the back of that pier. * * * Q. If tiled you do not know who tiled it? A. No, sir; because I don't consider it in our contract."

Plaintiff testified that by October, 1906, his building, except the basement, was completed, and that as to that there were uncompleted the windows, the plastering, the flooring, and the lighting. He also stated the precise obstacle to the completion of the basement, in that the city had to build their stairway and "had to tile and put marble on the walls, both on the Bridge street and on the Fulton street side. We couldn't get our show windows in before that work was done. They had to complete their subway over to Abraham & Straus before we could complete our work." Then he stated that it was "because of the condition of the subway work at or about the point of Bridge street" that he was unable to close the basement, and that in consequence he set the partition 40 feet back from the building line on Fulton street. His testimony then treats of the impediment caused by the subtunnel to Abraham & Straus, and upon cross-examination the history of construction was traced, and among other things the difficulty of erecting column No. 12 on Fulton street on account of the subway to Abraham & Straus, and the delays on account of the hole on Bridge street. He described an excavation on the corner of the two streets, 7 feet on Fulton street and 5 feet on Bridge street; stated that the partition was put back 40 feet, although, as concerns the hole, it would have been sufficient to put it back 7 feet; but he would explain that it was put back the 40 feet, so as to be sure that the city's workmen had plenty of room to work, although the city did not ask to use any of the spaces,

and because otherwise it would have been necessary to put the partitions along the wall on both Bridge and Fulton streets.  He further testified:

"Q. The *only* work I understand you to claim that the city had to do there was to do this marble and brick work, and when they came around the corners of any entrance into your place they would have to make returns, which a man would have to get inside to do; is that it?  A. Yes, sir."

The plaintiff further stated that beyond the seven feet—

"they had to tile and put marble on all the brick work, fronts, and returns. . * * * Q. The rear, you mean?  A. Yes; the returns on any of the corners that there might be.   Q. And that tiling, marble work, was on the city's side of the building line, was it not?  A. No, sir.   Q. Did they also tile your side? A. Where it came into a corner there, they had to go back."

The plaintiff seems to say in one answer that the failure to tile the returns was the only thing that prevented the finishing of the basement, and in another that the hole invading his property for seven feet was also involved.  The diagram attached to the contract calls for no construction inside the house line on Fulton street, although it does on Bridge street.  But it appears from the finished work that the foundations for the substation to Abraham & Straus are 7 feet inside of the plaintiff's building line.  The fact seems to be that the original plan was to build the stairs leading to the Abraham & Straus subway adjacent to the house line, but that in fact its actual construction involved an invasion of plaintiff's premises for the stairways for the tunnel leading to Abraham & Straus.  If such stairs afforded the entrance to the station, and under the contract should have been completed by October 1, 1906, the city cannot avoid it upon the ground that it built within rather than adjacent to plaintiff's line.

Upon a former appeal in this action (166 App. Div. 199, 151 N. Y. Supp. 1019), this court decided definitely that the contract referred to the entrance on Bridge street, and well it might do that, as even upon this trial the plaintiff testified that the entrance was to be on the Bridge street side, and his counsel so advised by him proceeded with the case on that understanding.  With that evidence in mind, let the contract be read where its very plain language is that the entrance shall be done by October 1st.  The learned trial court on the trial yielded his own construction of the contract to the decision, but found, through probable inadvertence, that the defendant failed to construct and to complete the *station,* stairway, and entrance, and thereby the plaintiff was unable to complete his building, and thereon the damages are predicated.  Although this court on the former appeal was beset by a record that presented the usual difficulties in building cases, its conclusion is accurate that the time limit referred to the entrance on Bridge street and to nothing else.  But how long, if at all, did the delay in building the Abraham & Straus subway and approach postpone the completion of the basement?  In one place plaintiff testified that the excavation for that was closed by September 1st.  The plaintiff was asked later what remained to be done on October 15th, and his answer was that the show windows were not in the basement floor, and that the basement was unfinished in particulars before noted, and he ascribed as reasons

for it that the construction of the footings and other work of the Abraham & Straus subway, and the tiling of the rough brickwork, which he describes as follows:

"Q. Tile what? A. The side, the idea being that this was a rough brick wall, and they had to tile and marble it, and they had to tile the returns, and after that we had our show windows. We couldn't put in our show windows until that was done."

But he also suggests a further cause for the incompletion that it was necessary that there should be supplied by the city at his expense a girder under the show windows on the street level. According to that, even if the entrance on Bridge street and the entrance on Fulton street had been completed, the absence of the girder would have delayd the completion of the basement. Later the plaintiff said that the show windows could not be inserted until the tiling was put in, and that the city would have to tile the returns before the glass could be set. After much and varied testimony, the plaintiff testified:

"Q. You said that was all there was to be done inside there. What was the subway contractor to do inside your building, along that line? A. They had to put up their marble and finish their tiling on the returns, before we could put any plate glass in. Q. Well, the wall was finished, was it not? The supporting wall all along there was finished? A. Yes. Q. And you could have closed off those windows with boards, couldn't you? A. Yes, sir. Q. And you could have then gone ahead and done all your plastering? A. Well, we only had, as I testified, we only had two days' work, all told, putting down the flooring and the plastering and the show windows. Q. Why couldn't you do all of that, except the show windows, at any time? A. We could; but we felt that the subway contractor had to go in that 40-foot space to work, and we didn't want him to work on a finished basement. Q. The work that they had to do, of course, was in connection with Fulton street? A. Both Fulton and Bridge streets; both."

Schiefer, superintendent of construction of plaintiff's building, testified concerning the 40-foot space that was cut off:

"The subway contractors were working in there. Q. Working in that 40 feet of space? A. I can't say whether they occupied the whole 40 feet, but they were in and out."

But when searched upon cross-examination it appears that the men from the subway were in that space building some foundations for the sub-subway to Abraham & Straus' store and for setting column No. 12, which was set by October 1st, and thereafter "there was nothing further for the subway people to do inside of that line." Finally, to the court, he gave the following equivocal evidence:

"Q. You say, 'I think so.' I want to get this point clear in my mind, if it can be made clear by you; and if you know nothing about it, say you do not. You tell us that some part of this 40-foot space was used by the subway contractors going in and out; they had gravel and cement in there, in about 12 feet of it. Was that after the 1st of October, or was it before? A. Subsequent. They had set their marble bases for our show windows. They also incased our columns with brick, and with tiling. Q. How long after was that? A. That I don't know. Q. Well, about how long after? A. Well, I couldn't tell you, your honor, because the building was completed then.

"By Mr. Reass: Q. You left the job then, didn't you? A. Yes, sir. Q. You only came back on occasions after that? A. Yes, sir."

The testimony adds to the confusion. The result of the evidence is that the plaintiff ascribed at times the cause of the delay (1) to the incomplete tiling of the returns; (2) to the excavation to receive the stairs for the tunnel to Abraham & Straus' store; (3) to the absence of the girder under the show windows on the street level. And yet here and there and at the end he states that the wall was finished, and the only thing remaining for the city to do inside his building was to tile on the returns, or where the wall in its width was exposed. The findings show that the court adopted the view that the failure to finish the *station* as well as the stairway and entrance caused the plaintiff the injury for which he recovered, although in my judgment the weight of the evidence, and that, too, supplied largely by plaintiff's own testimony, is that the tiling of the returns prevented the enclosure of the basement. But the defendant was not obliged to finish the station by October 1st.

To do justice to the parties in a matter so complicated, the court should be advised (1) in what manner the absence of tiling *required by the contract to be placed by the city* prevented the installation of the show windows; (2) whether the sub-subway under Fulton street and the girder under the show windows on the street level, one or both, prevented the inclosure of the basement, and, if so, how such failure has any bearing upon the issues. Lest there should be a trace of doubt, it is reiterated that the only entrance required to be built by October 1, 1906, was that on Bridge street, as the plaintiff has plainly testified, and that the plaintiff can recover only such damages as flow from the injury to the basement from failure to build that entrance. In the present state of the record, it is not useful to consider the question of damages.

The judgment should be reversed on the law and facts, and a new trial granted; costs to abide the final award of costs. All concur.